**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 13-40813 |
| | ) | |
| D & L ENERGY, INC., *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Judge Kay Woods |
| ———————————————— | ) | |
| | ) | |
| RESOURCE LAND HOLDINGS, LLC, | ) | |
| a Colorado limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Pro. No. |
| | ) | |
| D&L ENERGY, INC., | ) | |
| an Ohio corporation, and | ) | |
| PETROFLOW, INC., | ) | |
| an Ohio corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**
**(With Demand for Jury Trial)**

For its Complaint against the defendants, Debtors D&L Energy, Inc. and

Petroflow, Inc., plaintiff Resource Land Holdings, LLC ("RLH") states and alleges as

follows:

**STATEMENT OF THE CASE**

1.      RLH brings this action to remedy numerous material breaches the

Debtors/Sellers have committed under the Asset Purchase Agreement into which these

parties entered on November 27, 2013, which agreement this Court approved by its

Sale Order entered on December 9, 2103 (and docketed December 10, 2013).

2.      After spending hundreds of thousands of dollars conducting a due diligence investigation on an accelerated schedule and in accord with this Court's Sale Order, RLH identified numerous Defects in the Acquired Assets, multiple Sellers' breaches of the representations and warranties they made with respect to the Acquired Assets and on which RLH had relied to its detriment, breaches of other provisions of the APA, and other issues that would and did make RLH's due diligence more expensive and time-consuming, prevent RLH from completing its due diligence within the Due Diligence Period for which the APA provided, materially impair the value of the Acquired Assets, and constitute material breaches on which RLH was and is authorized and entitled to terminate the APA.

3.      Notwithstanding the numerous Defects, breaches of the APA and other issues, RLH continued to expend significant sums of money in conducting its due diligence, in working with the Sellers attempting to assist them in curing those of the Defects that were capable of being cured, remedying the breaches of representations and warranties that were capable of being remedied, and in otherwise helping the Sellers to comply with the APA and conclude a closing of the proposed sale of the Acquired Assets on some terms and conditions that would make sense in light of the very different facts the parties faced, all of which would mitigate RLH's damages.

4.      RLH has made every effort to work with counsel for the Sellers, the Creditors Committee and the Lupos to reach an informal resolution of these disputes, and to establish a value for the assets consistent with the numerous breaches of the APA, the condition of the Acquired Assets and the information RLH developed in its due

diligence. It was only when those efforts were not successful, and in the face of numerous other and/or repeated breaches, that RLH terminated the APA pursuant to the provisions of that contract.

5.    RLH brings this adversary proceeding to compel the return of its good faith earnest money deposits and to recover the damages it has incurred as a result of Seller's material breaches of the APA.

6.    Given the disputes that have arisen with the Debtors/Sellers, RLH also seeks the entry of a declaratory judgment that generally provides (and without in any way limiting the specific relief RLH seeks below) that:  (a) RLH timely and properly identified and notified Sellers of the existence of Defects as Section 3.1.6 of the APA defines that term; (b) RLH timely and properly identified and notified the Sellers of the existence of their breaches of their representations and warranties, as well as their breaches of other provisions of the APA; (c) RLH worked in good faith with the Sellers to attempt to identify and advise them of means by which they could cure the Defects, breaches of representations and warranties, and breaches of contract RLH had identified and that were capable of being cured or remedied; and (d) RLH properly terminated the APA, and is entitled to the return of its good faith earnest money deposits.

## PARTIES

7.    RLH is a Colorado limited liability company with its principal place of business located at 1530 Sixteenth Street, Suite 300, Denver, Colorado 80202.  RLH is authorized to transact business in the State of Ohio.

8.     D&L Energy, Inc. is an Ohio corporation with its principal place of business and the center of its operations located at 2761 Salt Springs Road, Youngstown, Ohio 44509.

9.     Petroflow, Inc. is an Ohio corporation with its principal place of business and the center of its operations also located at 2761 Salt Springs Road, Youngstown, Ohio 44509.

10.     According to the confidential "Information Memorandum" SS&G Parkland Consulting, Inc. ("SSGP") prepared, issued and made available to potential bidders in August 2013, and amended on September 30, 2013:  "Petroflow is an Ohio corporation which is a wholly owned subsidiary of D&L. . . .  Petroflow ceased all operations in early 2013 and has been integrated into the parent company, D&L."

11.     In this Complaint, RLH will refer to D&L Energy and Petroflow, collectively, as the "Debtors" or the "Sellers."

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This Court has jurisdiction to provide remedies for the post-petition breaches of the APA, to address the actual controversies that have arisen between RLH and the Sellers, and to declare the rights and other legal relations of these parties, pursuant to 28 U.S.C. §§ 1334 and 2201(a).  This is a "core" proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 157(b)(2)(A), (N) and (O).

13.     Venue for this adversary proceeding properly lies in this District because Sellers' filed their Chapter 11 cases in this Court, and this District is therefore the proper

- 4 -

venue for this action and the resolution of these disputes pursuant to 28 U.S.C.
§§ 1409(a) and (e).  In addition, in Section 12.20 of the APA the parties agreed this
Court was the exclusive venue for "any action or proceeding in respect of any claim
arising out of or related to" the APA.

14.     The statutory underpinnings for this adversary proceeding are
Sections 105(a), 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101,
*et seq.* (the "Bankruptcy Code").  RLH brings this adversary proceeding pursuant to
Bankruptcy Rules 7001(2), (7) and (9).

## STATEMENT OF FACTS

15.     On April 16, 2013 (the "Petition Date"), D&L Energy and Petroflow each
filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy
Code.  Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, Debtors assert
that both D&L Energy and Petroflow, as debtors in possession, have continued to
operate their respective businesses and manage their assets.

**A.     The Auction, RLH's Successful Bid, the Asset Purchase Agreement, and
the Court's Approval in the Sale Order**

16.     Debtors conducted an open and robust marketing and sale process for
substantially all of the Debtors' assets in accord with this Court's October 22, 2013 Sale
Procedures Order.  One of the first steps in that marketing and sales process was to
prepare and circulate the SSGP confidential Information Memorandum.

17.     The auction began on November 13, 2013 at which time four qualified
bidders attended.  The auction was then adjourned to November 16, 2103, at which
time two qualified bidders attended.  This auction process afforded a full, fair and

- 5 -

reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Debtors' assets. At the end of that process, RLH was the only bidder that submitted a bid and provided the required earnest money deposit.

18.    At the November 16 auction, the Debtors and RLH negotiated in a diligent, non-collusive, fair and good faith manner to come to a price term. In consultation with counsel for the Creditors Committee, the Debtors determined, in their best business judgment, that RLH had made the highest and best offer to purchase the Acquired Assets for $20,700,000 pursuant to the terms of an asset purchase agreement.

19.    Following the hearings held on November 19, 2013, the Court approved the sale of substantially all of the Sellers' assets to RLH, with the parties to finalize the asset purchase agreement thereafter.

20.    What then followed was a short period during which RLH, Sellers and the Creditors Committee, together with their respective counsel, negotiated the terms and conditions of a comprehensive asset purchase agreement.

21.    Late in the day of Thanksgiving Day eve, Wednesday, November 27, 2013, the parties concluded the negotiation and drafting of a proposed asset purchase agreement, and, at that time, RLH and Sellers signed a comprehensive Asset Purchase Agreement ("APA"). RLH attaches a true and correct copy of the APA to this Complaint as Exhibit A, and incorporates it herein by this reference.

22.    The Debtors determined that the terms and conditions set forth in the APA, and the consideration RLH provided as set forth in the APA, yielded the highest or otherwise best value obtainable for the Acquired Assets.

23.     With the signing of the APA, the Sellers then uploaded for this Court's review and approval the proposed agreement, a motion seeking the Court's approval of that agreement and a proposed order.  After reviewing the proposed order, the Court convened two telephonic hearings in which counsel for the Sellers, RLH and the Creditors' Committee participated, at which it identified for the parties those areas of the proposed order with which it was concerned and/or as to which it would require corrections, revisions or different verbiage.  During that process, Sellers also addressed and revised the proposed order to address the objections of those interested parties that had commented on and/or objected to the proposed order (which Objections this Court listed in Paragraph O of the Sale Order).  On the conclusion of these processes, Sellers provided the Court with a proposed form of order that they, and RLH and the Creditors Committee, believed addressed the Court's concerns and the interested party Objections.

24.     On December 9, 2013 the Court signed its *Order: (I) Authorizing the Sale of Substantially All of the Debtors' Assets, Other than Debtors' Interest in the No. 4 Disposal Well, Free and Clear of Liens, Claims, Encumbrances and Interests; and (II) Granting Related Relief* (the "Sale Order").  RLH attaches a true and correct copy of the Sale Order to this Complaint as Exhibit B (excluding, however, the attached copy of the APA that is identical to the document attached hereto as Exhibit A), and incorporates it herein by this reference.  The Clerk of the Court docketed the Sale Order on December 10, 2013.

25.     Pursuant to its express terms and Bankruptcy Rule 9006, the Effective Date of the Sale Order is December 26, 2013.

26.     The Sale Order referenced and incorporated the APA, and approved the APA to the extent set forth in that Sale Order.  (For consistency and ease of reference, RLH will use defined terms in this Complaint as the APA defines them and unless otherwise defined in this Complaint.)

**B.     The Pertinent Provisions of the APA**

27.     The APA acknowledged the fact that RLH had deposited with Sellers' counsel a total good faith earnest money deposit of $2,470,000.  $2,070,000 of that amount was the deposit under the APA.  RLH paid the remaining $400,000 to be held as ten percent (10%) of the $4,000,000 purchase price for Sellers' interests in a salt water injection well asset identified as "North Lima Disposal Well #4, LLC" that was to be the subject of a separately-negotiated asset purchase agreement.  (Because of issues with the minority member in that limited liability company, Shale Energy, LLC, and its rights of first refusal under the amended and restated operating agreement for that LLC [e.g., ECF nos. 231, 446, 461], Sellers and RLH did not include it as part of the Acquired Assets.)  The parties were to negotiate that separate agreement by December 2, 2013.  The parties specifically acknowledged and agreed that, in the event they did not sign a separate asset purchase agreement by that date, "then the [$400,000] North Lima DW 4 Deposit shall be returned to Buyer without deduction or setoff of any kind."

- 8 -

28.      In Section 1.1 of the APA, the parties agreed Sellers were selling, assigning, transferring, conveying and delivering to RLH "all right, title and interest in and to any, all and every asset" Sellers owned, excepting only those specific assets the parties defined as Excluded Assets.  The parties specifically identified a subset, but not all, of the Acquired Assets Sellers were selling to RLH on Schedules 1.1(a) and 1.1(b) to the APA, and expressly acknowledged that those schedules in no way limited the assets Sellers were conveying.

29.      In the form of asset purchase agreement RLH submitted before the auction and as part of its bid, RLH proposed to have the structure of a due diligence period, with the right to reduce the purchase price on account of the liabilities, defects and impairments it had discovered in its due diligence, where that price adjustment was to be one to which the parties were to agree.  Sellers proposed to have no accommodations for any deficiencies RLH discovered during due diligence.  The parties ultimately compromised between those two positions – and based on the comments of both Sellers and Creditors Committee's counsel as to what the Bankruptcy Court would accept – the parties drafted the provisions of Section 3.1.6 to identify three categories of assets that the parties believed were most prone to Sellers' error in identifying its interest(s) and assigned specific numbers for price reductions.  (The parties also agreed to a minimum threshold under which any such deficiencies would be *de minimis* and not give rise to any price reduction, and a threshold over which they were significant enough that RLH would have the option to terminate the APA.)

- 9 -

30.     As set forth in Section 1.4 of the APA, the only Sellers' liabilities or

obligations RLH agreed to assume were:  (a) those arising under Assumed Executory

Contracts from the Closing Date forward; and (b) those of Sellers' liabilities that the

parties specifically identified in Schedule 1.4.  Schedule 1.4 lists the assumed liabilities

(other than Assumed Executory Contracts) as "None."  Section 1.4 then provided:

> Other than these Assumed Liabilities, Buyer is not assuming and shall not
> be liable for any liabilities or obligations of the Sellers, nor for any claims,
> taxes, liabilities, surcharges, fees or obligations of any kind, in any way
> related to the conduct of the Business [as the first recital to the APA
> defines that term], or the ownership, operation or possession of the
> Acquired Assets on or prior to the Closing Date.

31.     The APA defined Sellers' knowledge (or any similar phrase or

qualification), at Section 1.5.3, as "the actual knowledge of Sellers, and the knowledge

that each such person would have reasonably obtained in the performance of each

such person's duties as Chief Executive Officer, President, and any other executive

officers of the Sellers."

32.     Section 1.6 makes the APA's recitals a substantive part of the parties'

agreement.

33.     Section 2.2.1 of the APA governs the return of the deposit in

circumstances such as those existing here where Sellers have materially breached the

APA and RLH has terminated the APA under Section 4.4(b).  It states:

> . . . a termination under Section 4.4(b) shall only give rise to the right of
> Seller to retain the Two Million Seventy Thousand Dollars ($2,070,000)
> Deposit Amount where such termination under Section 4.4(b) is due to
> Buyer's breach. . . .   In the event the Closing does not occur because this
> Agreement is terminated for any reason other than a termination by the
> Sellers under Sections 4.4(b) or (c), the Deposit Amount shall be returned
> to Buyer without deduction or setoff of any kind.

- 10 -

34.     The APA afforded RLH a Due Diligence Period of sixty (60) days from the

Effective Date, as set forth in Section 3.1.1.  Given the Effective Date of December 26,

2013, the Due Diligence Period ended on February 24, 2014.

35.     Section 3.1.1 sets forth the permitted due diligence as "such due diligence

as Buyer may determine is necessary and appropriate, in Buyer's sole discretion, and to

evaluate and review Seller's Business, and Books and Records [as Section 1.5.1

defines that term], . . . ."

36.     Importantly, given the short due diligence period and fast-track timetable

to the proposed Closing, Sellers agreed in Section 3.1.4 that they would reasonably

cooperate with RLH in the due diligence.  Specifically, Sellers agreed:

> Sellers, at Sellers' cost and expense, will cooperate with Buyer and
> Buyer's representatives and agents during the Due Diligence Period.
> Sellers will cause Sellers' Affiliates to cooperate with Buyer and Buyer's
> agents and representatives during this same period.  Sellers will make
> available to Buyer any of Sellers' officers and employees, and Sellers'
> accountants at no expense to Sellers, and will permit the examination, and
> duplication of Sellers' Books and Records to the satisfaction of
> Buyer, provided that any duplication of Sellers' Books and Records shall
> be at Buyer's expense.

37.     Further bolstering the requirements of Section 3.1 that Sellers cooperate

with RLH, Section 8.1 of that agreement directs:

> from and after the Effective Date for as long as reasonably required,
> Sellers shall preserve, and shall afford Buyer's officers, managers,
> independent public accountants, counsel, lenders, consultants, and other
> representatives, unfettered, and unimpeded access for examination and
> duplication, at all reasonable times, to the Sellers' assets, property,
> employees, . . . and all records or other information relating to the
> Acquired Assets or the Business, including Books and Records.

- 11 -

In addition, Section 12.8 of the APA provides, in pertinent part, that Sellers will deliver any further documents "reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein."

38.     Section 3.3 established the Closing Date as occurring no sooner than fifteen (15) and no later than (60) days after the end of the Due Diligence Period, unless Buyer exercised its unilateral right to extend that date in the event, as has been the case here, Sellers had not obtained Bankruptcy Court approval of the assumption and assignment of the Assumed Executory Contracts.

39.     Subsections 3.1.5 and 3.1.6 are two of the APA provisions that set forth the parties' agreements as to how to address matters of concern discovered during or as a result of the due diligence.  They provide:

> 3.1.5   Results of Examination.  Buyer may, at any time following the Effective Date and through the date of Closing, exclude any one or more of the Acquired Assets listed on Schedule 1.1(a), or any one or more of the contracts identified on Schedule 1.1(b), all in Buyer's sole discretion, based on the results of the due diligence authorized in Section 3.1.

> 3.1.6   Reduction in Purchase Price.  If Buyer during its Due Diligence Period determines there to be a Defect, as defined in Schedule 3.1.6, with any of the Acquired Assets listed on Schedule 3.1.6 it shall have the right to reduce the Purchase Price by the Purchase Price Reduction Amount, as defined on Schedule 3.1.6.  The Buyer shall deliver written notice of any Defect to the Sellers and the Sellers shall have five (5) days thereafter in which to notify Buyer of Sellers' intent to cure. Sellers shall have a right to cure any defect within one hundred twenty (120) days after receipt of Buyer's notice of defect, unless Buyer agrees in writing to an extension which shall in no event exceed ninety (90) days. Any request of Sellers to Buyer for an extension of time to cure a Defect shall not be unreasonably withheld.  The Sellers shall not be permitted to cure any Defect through tender or payment of a cash payment.  Sellers' obligation to cure a Defect as to which they provided timely notice shall survive the Closing.  The aggregate Purchase Price Reduction Amount,

for any Defect which is not cured by the Sellers, must exceed five percent (5%) of the Purchase Price for any purchase price reduction to be provided to Buyer.  In the event the Purchase Price reduction exceeds five percent (5%) of the Purchase Price, then Buyer shall be credited with the full aggregate Purchase Price Reduction Amount under Schedule 3.1.6, up to fifty percent (50%) of the Purchase Price.  Should the Purchase Price Reduction Amount exceed fifty percent (50%) of the Purchase Price, then Buyer shall have, in its sole discretion, the right to terminate the Agreement and receive a complete and full refund of the Two Million Seventy Thousand Dollars ($2,070,000) Deposit Amount without setoff or deduction.

40.      The APA sets forth those things Sellers must do as conditions precedent to RLH's performance at Section 4.2.  The three conditions precedent Sellers must satisfy before RLH would have any obligation to complete the transaction, and that are pertinent to these breaches and disputes, are:  (a) Sellers must have performed each and every one of their covenants [Section 4.2.1]; (b) all of Sellers' representations and warranties must continue to be true and correct in all material respects [Section 4.2.2]; and (c) Sellers and Sellers' Affiliates must have cooperated with RLH "in order to enable [RLH] to perform Buyer's due diligence as specified in Section 3.1."

41.      For the purposes of this Complaint, there are two principal, but not mutually exclusive, remedies for which the APA provides.  These result in three paths down which RLH can proceed:  (a) for the limited category of Acquired Assets specifically listed on Schedule 3.1.6, RLH can acquire the asset subject to a price reduction as set forth in the formulae contained in that Schedule; (b) for those of the Acquired Assets specifically listed on Schedule 3.1.6, and for matters not specifically identified as a Defect, RLH can pursue the remedies for breaches of representations and warranties, up to and including termination; and (c) for those of the Acquired Assets

- 13 -

not specifically listed on Schedule 3.1.6, RLH can pursue the remedies for breaches of representations and warranties, up to and including termination.

42.     RLH is entitled to terminate the APA under Section 4.4 if, among other grounds:  (a) Sellers have committed a material breach, and that breach has not been waived or cured within five (5) business days of the breaching party's receipt of notice of the breach "provided that such a breach is able to be cured"; or (b) the conditions set forth in Section 4.2 (including those RLH has outlined in paragraph 40 above) are ones Sellers have not satisfied or RLH has not waived.

43.     On termination of the APA, Section 4.5.1 provides the agreement is void and of no effect, and Section 4.6 requires the Deposit Agent to return the Deposit Amount ($2,070,000) to RLH.

44.     Expressly acknowledging that they were "[i]n addition to the representations and warranties contained elsewhere" in the APA, in Section 5 Sellers represented and warranted the following matters relevant to the Sellers' breaches and parties' disputes discussed in this Complaint:

> 5.3     Title to the Acquired Assets.  Except as set forth on Schedule 5.3 [on which the parties did not identify any permitted title exceptions], Sellers have and on the Closing Date will have complete and unrestricted power and the unqualified right to sell, assign, transfer, convey and deliver to Buyer, and will transfer and convey to Buyer at closing, . . . all of the Sellers' rights, title and interests in and to the Acquired Assets free and clear of any lease, lien, security interest, claim, charge, or encumbrance whatsoever, except as set forth in Schedule 1.4 [where the parties listed "None" under Assumed Liabilities].

> 5.4     Organization, Standing and Power.  . . . Each Seller has all requisite power and authority to own, lease and operate its properties[1], [and] to carry on its business as now being conducted . . . .

- 14 -

<sup>1</sup>Buyer acknowledges that the State of Ohio has revoked the
saltwater injection permits held by D&L Energy.

\*   \*   \*

5.6   <u>No Environmental Liabilities</u>.  To Seller's Knowledge, none
of the Acquired Assets are currently operating, or have previously
operated, in material contravention to any environmental laws, other than
as disclosed in <u>Schedule 5.6</u> [which, under Environmental Liabilities, the
parties list "None"].

5.7   <u>Salt Water Disposal Wells</u>.  Sellers are unaware of any issue
that would prevent the Ohio Department of Natural Resources from
issuing an operational permit to Buyer. . . .

45.     In Section 8.2, Sellers agreed to operate the Business in a commercially

reasonable manner and to not enter into any agreements that would be out of the

ordinary course of business.

46.     The parties expressly acknowledged and agreed in Section 8.4 that there

was nothing in the APA that would preclude Sellers from selling their interest in North

Lima Disposal Well #4, LLC.

47.     RLH has spent to date in excess of $1.05 million in conducting due

diligence and working with Sellers to identify assets, and attempting to structure cures,

to address Sellers' numerous breaches, to mitigate the damages Sellers' have caused

RLH and to proceed to some manner of closing.

**C.     The Pertinent Provisions of the Sale Order**

48.     In the Sale Order, the Court approved the auction process and RLH's

successful bid:

(a)     It found there had been proper, timely, adequate and sufficient

notice of the Sale Motion, the auction and the Sale Hearing;

- 15 -

(b)     It found the Debtors had conducted an open and robust marketing and sale process for substantially all of their assets in accord with the Sale Procedures Order, and the auction procedures afforded, a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the assets;

(c)     It noted the auction began on November 13, 2013 with four Qualified Bidders attending, and was continued to November 16 with two Qualified Bidders attending;

(d)     It found Debtors and RLH negotiated in a diligent, non-collusive, fair and good faith manner;

(e)     It found in accordance with the Sale Procedures Order, and in consultation with counsel for the Creditors Committee, the Debtors had determined, in their business judgment, that RLH had made the highest and best offer for the Acquired Assets with the purchase price of $20,070,000;

(f)     It found the Debtors had determined the terms and conditions of the APA, and the consideration RLH provided, reflected the highest or best value obtainable for the Acquired Assets;

(g)     It found a sale free and clear of all liens, claims, encumbrances and interests was necessary to avoid material and adverse impacts to the Debtors' estates and a sale that would have yielded substantially less value;

(h)     It declared RLH the Successful Bidder in accord with the Sale Order;

(i)     It authorized the Debtors to perform their obligations under the APA, and to take or perform such actions and expend such funds as may be necessary to effectuate the terms of the APA; and

(j)     It specifically directed:

The Buyer shall not assume, and shall be deemed not to have assumed, any liabilities or obligations of Debtors, except for those liabilities or obligations specifically set forth in the APA (the "Assumed Liabilities").

*   *   *

Except as otherwise specifically set forth in the APA, the Buyer shall not assume or be obligated to pay perform, and/or otherwise discharge, any liens, claims, encumbrances and interests of the Debtors arising pursuant to the Debtors' ownership, use or operation of their assets or facilities prior to the date of the closing.

Except for the Assumed Liabilities or as otherwise expressly provide for in his Sale Order or in the APA, . . . Buyer shall not have any liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets and/or arising before the date of this Sale Order.

(k)     Lastly, it held nothing in the Sale Order affected liabilities to governmental units under police and regulatory statutes (including environmental laws or regulations).

49.     The Court also approved the copy of the APA attached to the Sale Order (except that it approved Section 10.2 only to the extent set forth in that Sale Order).

**D.     RLH's Due Diligence, and Its Decision to Provide Sellers Early Notices of Breaches of the APA and Defects Under Section 3.1.6**

50.     RLH very promptly began its due diligence on December 26, 2013; the date that was both the Effective Date of the APA and the beginning of the Due Diligence Period.  To that end, RLH retained:  (a) Bob Rivkin to provide due diligence consulting

- 17 -

services with regard to financial reporting and oil and gas operations; (b) Purple Land Management ("PLM") as its consulting landmen to investigate the various oil and gas leases and other interests; (c) Skelly & Loy to conduct environmental investigations of the assets, including to perform Phase 1 Environmental Site Assessments (as the parties recognized in Sections 3.1.3 and 3.1.6 would be both necessary and appropriate); (d) Advance Resources International, Inc. to conduct engineering assessments and determine the technical feasibility of the salt water injection wells (including to liaise with Ohio Department of Natural Resources ("ODNR") personnel to verify the current status of wells and determine the requirements for restarting the permits); (e) HR Consultants, Inc. to interview Sellers' employees; (f) Integrated Petroleum Technologies, Inc. to inspect the surface facilities of the salt water disposal wells; (g) First American Title Co to provide title reports on the parcels of real property; and (h) Ballard Spahr LLP, to assist in investigating the legal status of various of the assets.

51.     While the APA is silent as to the timing of when Buyer should provide notice of any breaches of the APA, and, similarly Section 3.1.6 of the APA is silent as to the timing of when Buyer was to provide written notice of Defects, early in the due diligence process RLH decided that it would notify the Sellers of Defects and breaches promptly as it discovered them.  RLH decided to proceed in this fashion in an effort to afford Sellers the maximum amount of time to cure before a Closing Date and to attempt to make sure the maximum amount of the assets would be ready to be transferred at a Closing (and, of course, to preserve and protect its rights under the

APA). So, beginning on January 24, 2014 and less than a month after it began due diligence, RLH started sending notices to Sellers.

**E.    The Uncured Defect of, and Breach of Representation and Warranty from, Sellers' Inability to Convey Noble County Leases**

52.    From the outset of Sellers' marketing efforts, the Noble County, Ohio acreage was a material part of the Sellers assets to be conveyed in any proposed transaction. For example, in the confidential Information Memorandum SSGP prepared and made available to potential bidders in August 2103, and amended in September 2013 ("CIM"), SSGP: (a) touted the fact that, with "the development of hydrofracturing ('fracking') technology and the discovery of significant oil and gas reserves in the Utica and Marcellus Shale formations in Ohio and Pennsylvania, over the past several years D&L has been involved in marketing and selling the 'deep rights' to its oil and gas leases" (and footnoting to the chart on page 8 for details by county) [CIM at 1]; (b) included the Noble County acreage in the "deep rights" acreage listed as one of the principal asset groups in a "transaction summary" [CIM at 2]; (c) provided a "Summary of D&L Lease Acreage" (in the same format as what would eventually be Exhibit 1 to Schedule 1.1(a) of the APA) in which it listed 948 active lease acres in Noble County [CIM at 8]; and (d) specifically scheduled a Noble County lease inventory to include 21 active leases [CIM at 21]. Similarly, Schedule 1.1(a) to the form asset purchase agreement SSGP included as an attachment to that Information Memorandum included the Nobel County active leases among the assets to be sold.

53.    Sellers included among the Acquired Assets in the APA the 987 active acres located in Noble County, Ohio, specifically listing that acreage in Exhibit 1 to

Schedule 1.1(a) that they prepared. Sellers also included Noble County Lease Inventory as Acquired Assets in Schedule 1.1(a), subsection E(3), to the APA.

54. RLH at all times detrimentally relied on Sellers to accurately and completely schedule the Acquired Assets; particularly where the transaction was structured with due diligence to follow the bidding and signing of the asset purchase agreement, and where Sellers alone had the necessary information.

55. Exhibit 1 to Schedule 1.1(a) lists the total active acreage Sellers owned and were to sell to RLH as 6,830 acres. The 987 active acres in Noble County equaled approximately fourteen and one-half percent (14.45% rounded) of what Sellers represented they were selling as active acreage. Accordingly, this was a material part of the Acquired Assets.

56. As further proof of the materiality of this part of the Acquired Assets, on May 27, 2014 the Akron Beacon Journal reported Antero Resources had unveiled three of the biggest natural gas wells in Ohio – all located in Noble County. It further reported that all three wells are now among the Top 10 natural gas producers in Ohio. See http://www.ohio.com/blogs/drilling/ohio-utica-shale-1.291290/antero-hits-three-big-gas-producing-wells-in-noble-county-1.462407.

57. Section 1.1 of the APA specifically identifies Schedule 1.1(a) as one of the specific listings of assets the Sellers owned (and which the parties then defined as Acquired Assets). In Section 5.3 of the APA, the Sellers represented and warranted that they had title to the Acquired Assets, and both the power and right to convey those assets to RLH. RLH had no reason to question Sellers' inclusion of the Noble County

- 20 -

leases because the Sellers were supposed to know what they owned and what they represented and warranted. Given the lengthy negotiations leading up to, and the definitive and controlling nature of, the APA, RLH had no reason to think that any previous information Sellers might have offered would apply.

58.    Section 4.2 of the APA conditions RLH's obligation to close on the satisfaction of the various conditions listed in that Section, including Section 4.2.2's requirement that "[a]ll representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects as if made as of the Closing Date."

59.    On February 6, 2014, RLH notified Sellers of a material breach of the APA with respect to Sellers' inability to convey the Noble County acreage as part of the Acquired Assets. RLH provided that notice in the face of Sellers' disclosure on February 5, 2014 that all of the leases in Noble County had expired at some time in 2013, and, as a result, Sellers no longer owned that acreage.

60.    Even that Sellers' statement was incorrect. In true fact, as RLH has since learned, the leases were never active because D&L Energy had not paid the required bonuses to landowners such that the leases never went into effect.

61.    The absence of the Sellers' represented and warranted title to and right to convey the Noble County leaseholds is a material breach entitling RLH to terminate the APA. Specifically, Section 4.4 of the APA provides, in pertinent part:

>     Termination. Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned: ... (b) by either Sellers or Buyer if a material breach of any provision of this Agreement has been committed by

the other party and such breach has not been waived or cured within five (5) business days of the non-breaching party's receipt of notice of such breach by the other party, provided that such a breach is able to be cured; ... or (d) by Buyer if any of the conditions set forth in Sections 4.2 shall not have been satisfied by Sellers or waived by Buyer as of the Closing Date; ....

62.     While this did not appear to be a curable breach and Section 4.4(d) does not afford an opportunity to cure, RLH nonetheless afforded Sellers the five business days to which the APA refers in different contexts - or until February 13, 2014 - in which to cure this default as Section 4.4(b) provides.

63.     Sellers did not cure this default, and RLH is not aware of any effort Sellers made to obtain replacement Noble County acreage.

64.     In addition, rather than taking the draconian step of terminating the APA at that time as a result of this material breach, RLH attempted to continue working with the Sellers on the purchase of the remaining Acquired Assets and to discuss with them a mechanism to address their inability to convey this material part of the Acquired Assets. To that end, RLH did not terminate the APA at that time, and, instead, continued to expend considerable time and resources on attempting to complete the transaction. This was subject, however, to RLH's express statement that RLH was not waiving this material default and breach, or any of its rights and remedies, and was expressly reserving all of its rights and remedies while deferring any further action at that time.

65.     In response to RLH's notice of this material default, Sellers disputed that this was a material breach, and further disputed RLH's right to terminate the APA. Sellers' response included the following positions:

- 22 -

(a)     Contrary to Sections 1.1 and 5.3 of the APA, Sellers asserted D&L Energy did not warrant that it would transfer that acreage;

(b)     Even though this acreage was not in the three narrow categories of assets that Section 3.1.6 addressed, and the parties had not agreed to any re-pricing mechanism for assets not included in Section 3.1.6, Sellers asserted that RLH's remedy was limited to a price reduction; and

(c)     Sellers contended that, notwithstanding the integration clause contained in Section 12.3 of the APA, they had provided RLH on November 18, 2013 a draft of what was eventually revised and appended to the APA as Exhibit 1 to Schedule 1.1(a), and further contended that in that draft D&L Energy disclosed the acreage had expired (when, in fact, all that earlier draft did was list a "-" for the Noble County acreage; what was clearly a placeholder and not a deletion).

66.     In reply, RLH rejected each and every one of Sellers after-the-fact attempts to rationalize away the significance of this asset.  Among its rebuttals, RLH pointed out on February 19 that there is a material difference between a lack of marketable title or other deficiency in certain leasehold acreage so as to give rise to a Defect (as Sellers argued was an analogous situation) vs. a total absence of title at the time of contracting as to an entire class of assets (as RLH pointed out was the case here).  RLH further pointed out that, if there was in fact a mistake on Exhibit 1 to Schedule 1.1(a) as Sellers now claimed, it was a unilateral mistake on their part.

- 23 -

**F.    RLH's Notices to Sellers of the Existence of Defects, Breaches of Representations and Warranties, and Other Issues Discovered During the Due Diligence Period**

67.    RLH, through PLM, notified Sellers of various Defects related to specific leases on January 27 (three letters covering, respectively, Defect nos. 1-2, 3-18, 82-117), January 30 (Defect nos. 118-119), February 17 (two letters covering, respectively, Defect nos. 153, 154-160), February 18 (Defect nos. 154-162), February 19 (Defect no. 163), February 20 (two letters covering, respectively, Defect nos. 165-68, 169-172), February 21 (two letters covering, respectively, Defect nos. 164, 173), February 23 (Defect no. 362) and February 24, 2014 (four letters covering, respectively, Defect nos. 174-361, 363, 364-676, 677-2680).  (PLM grouped the Defects by similarity and identified the noticed Defects by number in order to assist with ease of tracking and discussing those Defects.  The numbering of Defects in this paragraph of the Complaint is not consecutive because RLH later withdrew certain of the notices based on its conversations with Sellers and further investigation of the issues with the wells.)

68.    In response to many of these notices (but not all of them), Sellers advised RLH that they intended to cure the noticed Defects within the one hundred and twenty (120) days for which Section 3.1.6 of the APA provided.  Those initial cure periods begin to expire on May 27, 2014 (120 days from January 27; the first notice of Defects) and the last expires on June 25 (120 days from February 24; the last notice of Defects).

69.    In response to the February 19, 2014 PLM notice letter (Defect No. 163), Sellers acknowledged "D&L Energy will not be able to provide a cure with regard to the

- 24 -

portion of the acreage noted." There, for the first time, Sellers also challenged RLH's calculations for the purposes of Section 3.1.6 where it started with the 9,577 acres – the same 9,577 acres Sellers represented on Exhibit 1 to Schedule 1.1(a) were Sellers' wholly leased acreage held by production – and then deducted from that figure the acreage for which RLH found Defects.

## G.    Sellers' Breaches of Their Agreement to Cooperate With RLH

70.    During the course of due diligence and while still in the Due Diligence Period, it became clear to RLH that Sellers were not cooperating as the APA and Sale Order required.

71.    As RLH continued to conduct due diligence and Sellers continued belatedly to discover and/or to provide copies of other contracts, RLH learned of other executory contracts that were material to the operations of the Business; both as Sellers conducted it and as RLH proposed to conduct it post-Closing.

72.    On March 4, 2014, RLH provided Sellers with formal notice of those assets to be excluded from Acquired Assets pursuant to the provisions of the November APA and the Sale Order. Because Sellers had not cooperated in the due diligence as RLH requested, had not provided copies of numerous contracts RLH had been able to identify from third parties or third-party sources, and had not agreed to extend the Due Diligence Period, RLH specifically reserved its rights and remedies as follows: "This list [of executory contracts to be excluded from Acquired Assets] is subject to the fact and corresponding RLH reservation of rights that it is based on the contracts Sellers have provided to RLH. Sellers have not provided all contracts to RLH."

- 25 -

1. **Sellers' material breaches in not providing documents to RLH during the Due Diligence Period and in response to RLH's specific requests**

73.     Sellers did not provide RLH copies of all of the contracts governing the Business notwithstanding RLH's repeated requests and itemizations of the missing items.  RLH made specific requests for documents during the Due Diligence Period and on February 7, February 11, February 12, February 14 (two letters), February 18, February 23, and also made further requests after the Due Diligence Period and on March 11, 2014 (two letters) and March 19, 2014 (two letters).

74.     On February 24, 2014, RLH provided formal notice to Sellers of their material defaults under the APA arising out of the fact that Sellers had not cooperated with RLH in conducting due diligence.  RLH specifically notified them of this separate group of material breaches pursuant to Sections 4.4(b), 4.4(d) and 12.2 of the November APA.  In pertinent part, RLH notified Sellers as follows:

> I will not repeat here the numerous requests for documentation and other assistance RLH has made to Sellers, if for no other reason than that record is clear from the numerous letters and emails RLH has sent to Sellers and their agents (as well as the summary charts RLH provided last week, in which it compiled, for Sellers' ease of reference, all of the outstanding and unresolved requests, and to which summaries RLH also referred during our Tuesday [February 18] morning conference call).  I will also not repeat here RLH's consternation at being bombarded on Thursday of last week, when there were only two full business days of the Due Diligence Period remaining, with an enormous volume of Sellers' documents, many of which RLH was receiving for the first time.  And, even with that last-minute offloading of documents, there remain numerous documents that Sellers either have not provided or have declined to provide as being too time-consuming or otherwise difficult for Sellers to assemble.
>
> In Section 3.1.4 of the November APA, Sellers agreed to cooperate with RLH during the Due Diligence Period (and to ensure that Sellers' Affiliates also cooperated with RLH).  That obligation included providing RLH

- 26 -

access to Sellers' Books and Records for review and copying to RLH's satisfaction.  Sellers have not complied with that Section and their obligations under it.

* * *

In addition to being breaches of the November APA, Sellers' actions and omissions have greatly increased RLH's expenses, have prolonged and delayed its due diligence efforts, and have led to a large number of Defects in what was to have been the Acquired Assets (and about which RLH has been providing Sellers notices on a rolling basis).

One of the conditions precedent to RLH's obligation to close, as Section 4.2.5 specifically sets forth, is that "Sellers and Sellers' Affiliates shall have cooperated with Buyer in order to enable Buyer to perform Buyer's due diligence as specified in Section 3.1."  Thus, in addition to the practical impediments to RLH being in a position to proceed to an orderly closing, there is also this contractual one.

75.      Compounding these problems and exacerbating this default, Sellers

delayed providing critical documents until after the Due Diligence Period had expired.

**2.      Sellers' material breaches in not disclosing Petro Evaluation contracts**

76.      In March 2014 – after the end of the Due Diligence Period and after RLH

was to have notified Sellers of the executory contracts it elected not to assume – Sellers

first disclosed to RLH the existence of an April 10, 2008 Exploration Agreement

(subtitled "D & L Energy Deep Prospects") between D&L Energy, Inc. and Petro

Evaluation Services, Inc. ("Petro Evaluation").

77.      Sellers also disclosed for the first time an April 9, 2008 letter from Petro

Evaluation to D&L Energy purporting to set out additional agreements "[i]n addition to

the current agreement." It is unclear whether those parties intended that letter to be a

stand-alone separate agreement, or a supplement or addendum to the April 10, 2008

agreement.

- 27 -

78.    The thrust of the arrangements with Petro Evaluation was to afford that entity a right of first refusal to own fifty-one percent (51%) of what were potentially some of Sellers most valuable assets located in Mercer and Crawford counties in Pennsylvania.  In other words, this Agreement, if enforced and enforceable, would create a long-term, material impairment on a significant portion of the Acquired Assets.

79.    In response to RLH's request, on February 25, 2014 and after the Due Diligence Period had expired, Gary Taneri (a D&L Energy representative) emailed Bob Rivkin (an RLH representative) a summary and back-up for all of the production data that D&L Energy was to enter into Petroware for the month.  (Petroware is the third-party software D&L Energy used that includes, for example: general ledger, revenue receipt and distribution, accounts payable, AFE, Form 1099s and joint interest billing functions.)  The parties agreed to perform that exercise monthly as part of the effort to identify missing agreements involved in the Business.

80.    Before entering into the APA, and until early May when Sellers first discussed their import with RLH, RLH was not aware of these Petro Evaluation contracts.  SSGP did discuss these contracts in the CIM and Sellers did not provide copies of these contracts in the data room SSGP established for Sellers.

81.    As the parties agreed they would proceed with the monthly review of Petroware information and associated contracts, Rivkin reviewed that information with Taneri (together with all of the other agreements Sellers had forwarded at that point in time) during the parties' second monthly review of production data, doing so on May 2 and May 5, 2014.

82.     RLH advised Sellers the Petro Evaluation agreement and the letter on related topics would require RLH to assume prepetition obligations and liabilities Sellers incurred (whether applicable to Sellers' actions taking place prepetition or post-petition), and which relate to the conduct of the Business and the ownership, operation and possession of the Acquired Assets on or before the Closing Date.

83.     As a result, on May 13, 2014, RLH provided Sellers formal notice supplementing its March 4 notice of assets to be excluded from Acquired Assets pursuant to the provisions of the November APA and the Sale Order.  That supplement added the recently-revealed Petro Evaluation agreements.

### 3.     Sellers' material breaches in not disclosing Gasearch contracts

84.     As another example, RLH discovered the existence of a number of contracts with Gasearch, in addition to the three to which it referred in its March 4, 2014 notice (accepting one and rejecting two).  Gasearch is an entity owned and controlled by D&L Energy insiders, Susan Faith and Ben Lupo, and the contracts appear to have been established as the vehicle by which those insiders overcharged investors to their personal benefit.  As promptly as it discovered the existence and understood the import of the additional contracts, RLH provided Sellers formal notice that it will not accept an assignment of any Gasearch contract, excepting only the one it specifically identified in that March 4 notice (the Gasearch Marketing Agent & Distribution Assistance Agreement dated June 5, 2013).  As a result, RLH stated that Sellers should add any and all other Gasearch contracts to the list of Excluded Assets (including, but not limited

to, the two gas purchase agreements RLH previously identified in its March 4 notice as Excluded Assets).

85.    RLH further reserved all of its rights to terminate that one Gasearch contract (dated June 5, 2103); whether pursuant to the express terms of the contract, due to the fact that this post-petition transaction does not bear any of the hallmarks of being an ordinary-course business transaction into which the Debtors would be authorized to enter under Section 549 of the Bankruptcy Code, or a would otherwise be necessary or appropriate.

86.    Of equal importance, RLH notified Sellers that assuming any such Gasearch contract would require RLH to assume prepetition obligations and liabilities Sellers incurred (whether applicable to Sellers' actions taking place prepetition or post-petition), or Sellers post-petition obligations and liabilities, relating to the conduct of the Business and the ownership, operation and possession of the Acquired Assets, all of which arise on or before the Closing Date.  Those liabilities are not transferable because they are not liabilities or obligations RLH has ever agreed to assume (and, by way of example only, are not listed on Schedule 1.4 to the November APA).  Thus, they are not Assumed Liabilities.  RLH has since notified Sellers that it rejects all Gasearch contracts.

## F.    Sellers Decline to Extend Due Diligence and Permit Additional Time to Effect a Cure of Their Breaches

87.    The reasons for the large number of Defects that RLH noticed on February 24 – the date the Due Diligence Period ended – are two:  (a) all of the acreage in Schedule 3.1.6, subparagraphs #1 and #3, was defective because of the Sellers

inability to provide the requested documentation demonstrating, respectively, that wells were held by production and the existence of and Sellers' interests in joint ventures; and (b) Sellers declined to extend the Due Diligence Period to allow the parties to attempt to resolve some of the outstanding issues.

88.     When it became apparent that Sellers had not timely provided and could not provide the information RLH required and had requested to conduct its due diligence, and the result of the Sellers' failures would be a host of notices of Defects and other breaches arising out of the absence of necessary and reasonable documentation (as well as from other causes), RLH offered on February 19 to allow an extension of the Due Diligence Period and resulting Sellers' cure notice periods so as to attempt to avoid that outcome.

89.     Even with that request for an extension of the Due Diligence Period in an attempt to deal with the Defects and breaches, RLH continued to attempt to complete a renegotiated transaction within the original time frame.  When RLH asked Sellers to agree to an extension of the Due Diligence Period, RLH specifically told Sellers that this proposed extension did not include and would not require an extension of the Closing Date.

90.     Sellers declined RLH's request to extend the Due Diligence Period.  As a result, RLH provided Sellers the notices of the numerous Defects and breaches it had discovered as of the end of the Due Diligence Period.

91.     Because the Due Diligence Period ended on the day RLH provided the notices, it further advised Sellers that these did not appear to be breaches that Sellers can cure in the face of their decision not to extend the Due Diligence Period.

**G.     The Parties' Disputes Over the Application of Section 3.1.6**

92.     The parties negotiated specific price reductions for certain assets that were later found to have deficiencies and were not as Sellers had represented, and defined both the applicable deficiencies as "Defects" and set forth a formula to determine the applicable price reduction for Sellers' purchase of those assets.  These provisions are located at Section 3.1.6 of and Schedule 3.1.6 to the APA.

93.     As is typical with a "scratch and dent" sale of this nature, and to provide a mechanism by which the parties could proceed to closing without any other or further negotiation, Buyer's purchase of these specific assets, but only these assets, was pursuant to a negotiated price reduction for only those specific deficiencies.

94.     During the course of the parties' discussions over the existence, potential to cure and timetables to cure some of the Defects RLH had identified and about which it had notified Sellers, Sellers took the position that, where RLH had identified a Defect and was entitled to a price reduction for a particular assets, Sellers were no longer required to convey the asset and could exclude it from the Acquired Assets.

95.     Notwithstanding that this position has no support in any provision of the APA, and is contrary to the accepted structure and operation of a "scratch and dent" sale, Sellers claimed to be entitled to retain the asset if RLH received a price reduction. And, while the parties had not set forth in the APA any particular schedule of value for

- 32 -

the assets conveyed, and had instead agreed to the sale of all of the Sellers' assets excepting only the specifically-defined Excluded Assets, Sellers and the Creditors Committee wrongly and unreasonably argued that to proceed in any other way would be giving RLH "something for nothing."

96.     Tellingly, the parties' definition of Excluded Assets in Section 1.2 of the APA likewise did not contain any provision that an asset subject to a Defect that Sellers could not cure or elected not to cure, and for which RLH would be entitled to a price reduction, would then become an Excluded Asset that Sellers would be entitled to retain.

97.     And, further demonstrating the error of Sellers' and the Creditors Committee's positions – and proving that when the parties wanted to provide for assets to revert to Sellers' ownership, they knew the necessary and appropriate language to use to accomplish that result – Section 1.2.9 of the APA contains the only provision by which an asset listed as an Acquired Asset would revert to Sellers. Yet, Section 1.2.9 applies only to the joint ventures specifically listed on Schedule 1.1(a) and to those executory contracts specifically listed on Schedule 1.1(b) as to which RLH elected not to accept an assignment of the contract.

98.     Given Sellers' position on the operation of Section 3.1.6 of and Schedule 3.1.6 to the APA – and the importance of those provisions to the APA structure governing both pricing and the definition of those portions of the Acquired Assets, as well as to any closing that might occur – Sellers' have anticipatorily repudiated the APA.

- 33 -

**I.** **Sellers Breaches and Uncured Defects With the Salt Water Disposal Wells, and RLH's Reasons for Not Proceeding With the Separate To-Be-Negotiated Asset Purchase Agreement for North Lima Disposal Well #4, LLC**

99. There are three salt water disposal well assets that the APA discusses: (a) North Lima Disposal Well II ("SWD #2") listed on Schedule 3.1.6; (b) North Lima Disposal Well VI ("SWD #6") listed on Schedule 3.1.6; and (c) Sellers' ownership interest in North Lima Disposal Well #4, LLC ("SWD #4"), the owner of the North Lima Disposal Well IV, discussed in the fifth recital and Sections 1.2.8 and 8.4 of the APA.

100. Sellers stated, in Section 5.7 of the APA, that they were not aware of "any issue that would prevent the [ODNR] from issuing an operational permit" to RLH. With that representation, Sellers invoked the Knowledge requirements of the APA.

101. In a footnote to the APA, Sellers disclosed that the Ohio Department of Natural Resources ("ODNR") had revoked their permits to operate salt water disposal / injection wells.

102. In the confidential Information Memorandum SSGP put together and on which Sellers advertised the assets for sale, Sellers stated that seismic events pegged to another one of D&L Energy's injection wells had "triggered an indefinite moratorium on the drilling and permitting of Class II injection wells pending the amendment of Ohio's Underground Injection Controls Program. These regulations have since been amended, and disposal well operations have resumed in the State of Ohio, and in this general area."

103. Sellers did not disclose in the CIM the existence or the status of litigation D&L Energy had brought against ODNR regarding the injection well permits. RLH first

- 34 -

learned of the fact that D&L Energy was litigating against the State of Ohio (specifically ODNR) to obtain permits for those wells during the course of its due diligence. The existence of that litigation demonstrates the inaccuracy of Sellers' representation, in Section 5.7 of the APA, that they were not aware of "any issue that would prevent the [ODNR] from issuing an operational permit" to RLH.

104.    The overarching issue with the three salt water disposal / injection wells that are the subject of or discussed in the APA is that, not only has the ODNR revoked the permits it issued to Sellers to operate these wells, it has more generally imposed a moratorium on permitting these wells on account of the seismic disturbances and resulting state-wide public uproar about these and the other danger from injection wells.

105.    These wells are now saddled with additional operational, regulatory and environmental claims and obligations. RLH contacted ODNR to determine whether there was any reasonable course to resolve the environmental liabilities that were impairing the sale of the injection wells. ODNR's representatives expressed skepticism that the wells would ever be permitted.

1.    **Sellers' breaches of representations and warranties with respect to, and Defects in. SWD #2 and SWD #6**

106.    Initially, and as SSGP stated in the CIM, Sellers were not offering SWD #2 as part of the assets to be sold (although they offered no explanation as to why they discussed it as an asset, yet elected not to include it in the assets offered for sale stating "#2 is not for sale at this time").

- 35 -

107. From the outset of due diligence, there were issues with RLH's ability to even access SWD #2 because the landlord would not permit it. RLH promptly notified Sellers of that issue on January 24, 2014.

108. Standing alone, the inability to access the property is a condition that both the applicable law and the consulting profession consider a recognized environmental condition ("REC"). Accordingly, on February 21, 2014, RLH notified Sellers of this, and two additional RECs over and above those that were the subject of the January 24 notice. Further, on May 29, 2014, RLH notified Sellers of three more RECs identified in the Phase I ESA that RLH had commissioned.

109. Pursuant to Schedule 3.1.6(2) to the APA, the existence of those RECs entitled RLH to a Purchase Price Reduction of $1.3 million.

110. RLH learned that the reason why it was denied access was, at least in part (if not in its entirety), because the landlord has a dispute with Sellers and claims the lease terminated because of D&L Energy's prepetition defaults (as explained more fully in the landlord's pleading filed on December 4, 2013). Accordingly, on January 24, 2014, RLH notified Sellers of the existence of a Defect under Section 3.1.6 and Schedule 3.1.6, subparagraph (2), of the APA.

111. On February 21, 2014 – three calendar days before the Monday, February 24 end of the Due Diligence Period – RLH notified Sellers that, notwithstanding its best and repeated efforts, it had still been unable to access the SWD #2 site in order to complete a Phase I Environmental Assessment.

112.    On February 12, 2014, RLH notified Sellers of Defects concerning SWD #6 based on the title commitment it had obtained showing that Sellers did not have marketable title and the leasehold was not in good standing.  This was pursuant to Schedule 3.1.6(2)(i) in which the parties specifically defined Defects for the purposes of the two salt water injection wells to include "leasehold is invalid, not enforceable, . . . there is not marketable title, . . . and/or not in good standing."

113.    In response, Sellers disputed whether the items the title company reported were Defects "in regard to this particular type of lease," but offered no explanation or support for that conclusion.

114.    On February 19, 2104, RLH notified Sellers of the additional Defect with respect to SWD #6 based on the fact that Sellers had contractually granted the landlord a royalty equal to "the sum of six and five tenths percent (6.5%)" when the definition of Defect included where the leasehold was "subject to a landowner royalty greater than 6%."

115.    In response to that February 19 notice letter, Seller notified RLH of their intent to cure that Defect.  Sellers have not yet cured that Defect.

**2.    Sellers' failure to timely negotiate an asset purchase agreement for North Lima Disposal Well #4, LLC and RLH's justified decision not to acquire a defective asset**

116.    As RLH notes above, the SWD issues and ODNR's position give rise to a breach of the Sellers' covenant that the Acquired Assets are not subject to any environmental liabilities.

117.    Proceeding in parallel with its due diligence, RLH also worked with Sellers to negotiate the separate asset purchase agreement for SWD #4.  As per the fifth recital of the APA, the parties were to negotiate that separate agreement by 5:00 p.m. (EST) on December 2, 2013.  The parties did not negotiate that separate agreement by that deadline.

118.    After that deadline had passed, Sellers stated they wished to conclude that negotiation and to do so before presenting a proposed sale order to the Court.  On December 5, Sellers' counsel said:  "We need to address Well No. 4.  The APA calls for a separate purchase agreement on that well. . . .  We need to resolve this before the Sale Order is complete."  Sellers did not, however, move to conclude the negotiation by the December 9 date on which it uploaded the Sale Order for this Court's review.

119.    Sellers requested additional time in which to negotiate that transaction, and on December 9 their counsel went so far as to ask:  "Can we agree that buyer will purchase well no. 4 without a time limitation for APA?"  (This was an idea he attributed to Creditors Committee counsel.)  RLH declined to proceed on that basis.  Instead, RLH agreed only to extend the period to reach that agreement for a reasonable period of time.  But, RLH requested that Sellers appropriately document and consider whether they should obtain the Court's permission for any such extension.

120.    Specifically, RLH's counsel said:

Thank you for the gracious offer of allowing the Debtors and RLH until January 30, 2014 in which to negotiate the Lima #4 APA.

I've talked to the folks at RLH, and we propose to keep things moving on a faster schedule and, instead, to use a new deadline of Friday,

- 38 -

> 1/3/14. Please let me know if that's acceptable to the Debtors and the Committee.
>
> And, as we discussed in concept late last week, I also think we should do a very simple amendment to the APA to document the agreement on the new deadline.

In response, Sellers' counsel requested until January 10, 2014 to accommodate the year-end holidays and his firm's office move, with which request RLH agreed (saying "1/10/14 will work for RLH. RLH is certainly willing to accommodate your firm's move, and picked 1/3/14 just so it wouldn't be slowing the processes.").

121. The parties did not conclude an asset purchase agreement for SWD #4 by January 10, 2014.

122. With the additional information it had gained during due diligence, in January RLH advised Sellers (and counsel for the equity holders in D&L Energy) that it would not be going forward to complete the negotiation of that separate asset purchase agreement for SWD #4. While RLH had been negotiating the terms and conditions of that transaction in good faith, RLH advised both Sellers and equity that good faith does not require it to continue to negotiate the purchase of an asset that cannot be used for its intended purpose as an injection well and the purpose on which RLH (and presumably Sellers) based the $4 million valuation set out in the fifth recital of the APA.

123. On February 21, 2014, RLH notified Sellers that its consultants at Advanced Research had identified: (a) based on their detailed conversations with ODNR, that the state could not permit the salt water injection wells without the Governor's approval; and (b) the daily capacity of the SWD wells was only twenty-five percent (25%) what D&L represented in the CIM for the wells (and noted further that

when RLH had met with Paparodis and Taneri a few weeks previously, they told RLH that plugging back SWD well #4 well had only reduced the capacity of the well by five percent (5%) such that those statements were untrue (or, even if RLH was to cast those statements in their most positive light, ones the two Sellers' officers made recklessly and with no factual basis).).

124.    On May 29, 2014, RLH notified Sellers of the two RECs identified in the Phase I ESA that RLH had commissioned.  While SWD #4 is not one of the assets subject to Section 3.1.6 of and Schedule 3.1.6 to the APA, the significance of the existence of the RECs is demonstrated by the fact that in the APA the parties agreed that the existence of RECs in connection with the saltwater injection wells included as Acquired Assets was a Defect entitling RLH to a multi-million dollar reduction of the Purchase Price amount.

125.    While Sellers specifically reserved in the APA the right and ability to sell North Lima Disposal Well #4, LLC to some interested party that was not RLH, RLH is informed and on that basis believes that Sellers have not made any effort to do so.

### FIRST CLAIM FOR RELIEF

126.    RLH realleges each and every allegation contained in paragraphs 1 through 125 of this Complaint as if fully stated herein.

127.    The APA is a valid and binding contract into which Sellers freely and knowingly entered, with the advice and consent of both their own counsel and counsel for the Creditors Committee.

128.    As set forth above, Sellers have committed material breaches of the APA.

- 40 -

129.    These breaches are ones Sellers have not, and in some instances could not, cure, and are ones RLH has not waived or excused.

130.    Pursuant to Section 4.4(b), RLH properly and lawfully terminated the APA because of Sellers' material breaches of the provisions of the APA, where Sellers did not cure (where the breach was able to be cured) within five (5) business days of when Sellers received RLH's notice of the breach, and RLH did not waive the breach.

131.    Pursuant to Section 4.4(d), RLH properly and lawfully terminated the APA because of Sellers' inability or failure to satisfy all of the conditions set forth in Section 4.2 of the APA, which conditions are not capable of being satisfied in advance of any closing, and none of which conditions RLH has waived.

132.    With respect to the various breaches and failures of condition referenced here, RLH has not agreed to an extension of the time for Sellers' performance.  (The only cure periods RLH agreed to extend to July 1 were those on the 120-day cure period schedule for which Section 3.1.6 provides.)

133.    As a direct and proximate result of Sellers' breaches, RLH has been damaged in the amounts it has incurred in conducting its due diligence, in an amount that is not less than $1.050,000.

134.    All conditions precedent or concurrent that may exist with respect to RLH's entitlement to the relief it seeks for these breaches of contract have occurred, or have been met, fulfilled or waived.

## SECOND CLAIM FOR RELIEF

135. RLH realleges each and every allegation contained in paragraphs 1 through 134 of this Complaint as if fully stated herein.

136. There currently exists an actual and substantial controversy as between and/or among RLH and Sellers as to:

(a) Whether RLH timely and properly identified and notified Sellers of the existence and specific nature of Defects as Section 3.1.6 of the APA defines that term;

(b) Whether RLH timely and properly identified and notified the Sellers of the existence of their breaches of their representations and warranties made in the APA, as well as their breaches of certain other provisions of the APA;

(c) Whether the APA provides RLH with non-exclusive remedies that afford RLH three paths down which it can proceed to address Defects and breaches: (i) for the limited category of Acquired Assets specifically listed on Schedule 3.1.6, RLH can acquire the asset subject to a price reduction as set forth in the formulae contained in that Schedule; (ii) for those of the Acquired Assets specifically listed on Schedule 3.1.6, and for matters not specifically identified as a Defect, RLH has the remedies for Seller's breaches of representations and warranties, or material breaches of other provisions of the APA, up to and including termination; and (iii) for those of the Acquired Assets not specifically listed on Schedule 3.1.6, RLH has the remedies for breaches of

representations and warranties, or material breaches of other provisions of the APA, up to and including termination;

      (d)      Whether RLH properly terminated the APA; and

      (e)      Whether RLH is entitled to the return of the Deposit Amount and the North Lima DW 4 Deposit in the combined amount of $2,470,000, both without setoff or deduction of any kind.

137.    Declaratory relief will resolve these controversies.

138.    This declaratory action and the relief RLH seeks serve a useful purpose in clarifying the legal relations under the APA that are in issue.

139.    The declaratory relief RLH seeks is not being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata."

140.    This declaratory action does not increase friction between the federal and state courts, and does not encroach, much less improperly encroach, upon state jurisdiction.

141.    There is no alternative remedy that would be better or more effective.

142.    RLH asks the Court to resolve the presently-existing controversies that have arisen between and among RLH and the Sellers set forth in paragraph 136, and entering a judgment declaring as follows:

      (a)      RLH timely and properly identified and notified Sellers of the existence and specific nature of Defects as Section 3.1.6 of the APA defines that term;

- 43 -

(b)    RLH timely and properly identified and notified the Sellers of the existence of their breaches of their representations and warranties made in the APA, as well as their breaches of certain other provisions of the APA;

(c)    The APA provides RLH with two principal, but not mutually exclusive, remedies that, in turn, afford RLH three paths down which it can proceed:  (i) for the limited category of Acquired Assets specifically listed on Schedule 3.1.6, RLH can acquire the asset subject to a price reduction as set forth in the formulae contained in that Schedule; (ii) for those of the Acquired Assets specifically listed on Schedule 3.1.6, and for matters not specifically identified as a Defect, RLH has the remedies for Seller's breaches of representations and warranties, or material breaches of other provisions of the APA, up to and including termination; and (iii) for those of the Acquired Assets not specifically listed on Schedule 3.1.6, RLH has the remedies for breaches of representations and warranties, or material breaches of other provisions of the APA, up to and including termination;

(d)    RLH properly terminated the APA; and

(e)    RLH is entitled to the return of the Deposit Amount and the North Lima DW 4 Deposit in the combined amount of $2,470,000, both without setoff or deduction of any kind.

143.    All conditions precedent or concurrent that may exist with respect to RLH's entitlement to the relief it seeks in this Complaint have occurred, or have been met, fulfilled or waived.

- 44 -

## REQUEST FOR SPEEDY HEARING

Pursuant to Rule 57 of the Federal Rules of Civil Procedure, RLH requests that the Court order a speedy hearing of this adversary proceeding.

## JURY DEMAND

RLH demands a trial by jury of to all issues properly tried to a jury and as is its right under Rule 38 of the Federal Rules of Civil Procedure and Bankruptcy Rule 9015.

RLH has filed with this Complaint its separate demand for a jury trial as Bankruptcy Rules 5005 and 9015(a) require.

WHEREFORE, RLH prays for the entry of a judgment

A.     In its favor and against the Sellers, jointly and severally, finding they breached the APA and awarding it damages in an amount to be proved at trial; and

B.     Declaring its rights and finding as follows:

1.     RLH timely and properly identified and notified Sellers of the existence and specific nature of Defects as Section 3.1.6 of the APA defines that term;

2.     RLH timely and properly identified and notified the Sellers of the existence of their breaches of their representations and warranties made in the APA, as well as their breaches of certain other provisions of the APA;

3.     The APA provides RLH with two principal, but not mutually exclusive, remedies that, in turn, afford RLH three paths down which it can proceed:  (a) for the limited category of Acquired Assets specifically listed on Schedule 3.1.6, RLH can acquire the asset subject to a price reduction as set

- 45 -

forth in the formulae contained in that Schedule; (b) for those of the Acquired Assets specifically listed on Schedule 3.1.6, and for matters not specifically identified as a Defect, RLH has the remedies for Seller's breaches of representations and warranties, or material breaches of other provisions of the APA, up to and including termination; and (c) RLH has the remedies for breaches of representations and warranties, or material breaches of other provisions of the APA, up to and including termination;

    4.     RLH properly terminated the APA; and

    5.     RLH is entitled to the return of the Deposit Amount and the North Lima DW 4 Deposit in the combined amount of $2,470,000, both without setoff or deduction of any kind; and

C.     Awarding RLH such other and further relief as the Court find is proper.

DATED: May 30, 2014.          Respectfully submitted,

/s/ Andrew J. Petrie
Andrew J. Petrie (*pro hac vice*)
BALLARD SPAHR  LLP
1225 Seventeenth Street, Suite 2300
Denver, Colorado  80202-5596
Telephone:  303-292-2400
Facsimile:  303-296-3956
petriea@ballardspahr.com
*Attorneys for Resource Land Holdings, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 30th day of May, 2014, service of the foregoing **COMPLAINT FOR DECLARATORY JUDGMENT (With Demand for Jury Trial)** was effected on the following via e-mail:

Kathryn A. Belfance
Lawrence R. Bach
Todd A. Mazzola
Brian T. Angeloni
Steven J. Heimberger
Roderick Linton Belfance LLP
50 South Main Street, Tenth Floor
Akron, Ohio 44308

/s/ Robin E. Anderson